SCANNED at WVCF and Emailed on
_2-2-24_ by _LDS_ - _93_ pages.
(date)    (Initials)    (num)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

*Kerel L. Seabrook*
                    Plaintiff,        )
                                      )
    vs.                               )
                                      )
*Superintendant Vanihel et al,*       )
                    Defendant,        )    Case No.: 2:24-cv-00043-MPB-MKK
                                      )           (TO BE SUPPLIED BY THE CLERK)
(Enter above the full name of the     )
Defendant(s) in this action.)         )
                                      )
                                      )
                                      )
                                      )
                                      )

**FILED**

**02/02/2024**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

## COMPLAINT

### I.  PARTIES

The names and addresses of each plaintiff and defendant are as follows:

A.  Plaintiff:

Name _Kerel L. Seabrook_

Identification Number _# 126312_

Address _Wabash Valley Correctional_
_P.o. Box 1111 Carlisle, IN 47838_

B.  Defendant(s)

Name _Superintendant Vanihel_

Title _(Warden)_

Address _Wabash Valley Correctional_
_P.o. Box 1111 Carlisle, IN 47838_

Name _Sergeant Hall_

Title _Staff Sergeant_

Address _WVCF / P.o. Box 1111_
_Carlisle, IN 47838_

BK3

-1-

Name _Correctional Officer Phillips_
Title _Custody officer_
Address _WVCF / P.o. Box 1111_
_Carlisle, IN 47838_ _(Continued pg 2(b))_

(Identify additional plaintiffs and defendants on a separate sheet of paper using this same outline)

## II.    STATEMENT OF JURISDICTION AND PREVIOUS LAWSUITS:

Jurisdiction over this action exists in the United States District Court for the Southern District of Indiana because _This action arises under and is brought pursuant to 42 U.S.C section 1983 to remedy the deprivation, under color of state law, of rights guaranteed by the First and Eighth Amendments of the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1343._

If the same facts alleged or claims made in this suit have been previously presented to any other state or federal court in an earlier suit, for each such earlier suit identify the parties, the Court in which it was filed, the docket number assigned to the suit, the status of such earlier suit, (for example: pending, dismissed, set for trial, on appeal, etc.). and the nature of the disposition if the earlier case is closed.



_The plaintiff has filed no other civil action regarding the facts involved in this action. However, this case is related to Peabody v. Wexford, et. al., No. 2:2?-cv-00228-JPS-MKK._

## IV.   CAUSE OF ACTION

State which of your constitutional or federal rights, privileges or immunities have been violated and summarize in one or two sentences what the defendant(s) did to violate your rights in that regard.  If you are claiming that more than one of your constitutional rights were violated, use a separate paragraph (ground) for each right, privilege or immunity which was violated.  If you have more than three (3) grounds, identify them in a separate attached piece of paper.

**BK3**

Defendants (Continued)

NAME: Correctional Officer
Sandoval

TITLE: Custody Officer

Address: WVCF / P.O. Box 1111
Carlisle, IN 47838

NAME: Matt Leohr

TITLE: Classification Supervisor

Address: WVCF / P.O. Box 1111
Carlisle, IN 47838

Ground 1: The Seventh Circuit recognizes that the Constitution prevents governmental actors from forbidding, or penalizing, speech that is protected under the First Amendment (see: Fairley v. Andrews, 578 F.3d 518 (7th Cir. 2009)). Furthermore, it is recognized that labeling a prisoner a snitch can violate the prisoner's constitutional rights, at least if the label is applied with deliberate indifference to a substantial risk of harm to the inmate (see: Ascherman v Catt, 2003 U.S. Dist. Lexis 4566). Defendants Hall, Phillips, Sandoval And Leohr were all personally involved in a Campaign of Harassment against the plaintiff, in retaliation for exercising protected speech (see: Bridges v. Gilbert, 557 F.3d 541 (7th Cir. 2009)). This Campaign of Harassment includes, but is not limited to: A) maliciously circulating a false narrative that the plaintiff was a snitch, which resulted in Him being snagged [Exhibits: I - IX]; B) Threats of manufactured disciplinary charges (see: Butts v. Henlunn, 826 Fed. Appx 561, 564 (7th Cir. 2020)) [Ex: X-XI]; C) Threats of physical Harm

BK1

(see: Fairley, supra) [Ex X-XI ; d.) A noose placed on his bed by custody staff [Ex XII-XVI ; And other retaliatory acts that are prohibited by The First Amendment (see: Delalt v Carter, 224 F.3d 607, 618 (7th Cir. 2000). Thus violating The plaintiff's First and Eighth Amendment rights under The United States Constitution.

Ground 2: The plaintiff Alerted Defendant Vanihel, who is The Warden At WVCF, to The fact that several members of his custody staff were maliciously spreading falsehoods that The plaintiff was A snitch to other prisoners on October 13, 2023 [Ex: VI], And once again on November 9, 2023 [Ex: XVII]. Defendant Vanihel failed to take reasonable measures to guarantee The safety of The plaintiff and protect him from violence At The hands of other prisoners despite receiving The information prior to The plaintiff being stabbed on November 20, 2023 in response to These false labels [Ex. I-IV]. Thus,

BK1

-4-

violating the plaintiff's Eighth Amendment right by his blatant show of deliberate indifference (see: Farmer v. Brennan, 511 U.S. 825 (1994)).

## Statement of Facts

On June 9, 2022, the plaintiff filed a §1983 regarding a delay in treatment for Colon Cancer (see: Seabrooks v Wexford et. al., Cause No. 2:22-cv-00223-JPH-MKK), in which Defendant Hall is listed as a defendant therein. The declarations in Seabrooks v Wexford charge Defendant Hall with ignoring the plaintiff's pleas for Health Services in the middle of a serious medical episode. Shortly after reporting Defendant Hall's show of deliberate indifference, the plaintiff's family began contacting IDOC officials expressing concern. The next time the plaintiff encountered Defendant Hall they engaged in a negative transaction where Defendant Hall defended her decision to delay and/or deny medical treatment that night, accusing

BK1

The plaintiff of not being actually ill, but rather having overdosed from illicit drug use. The plaintiff denied this accusation vehemently and ended the conversation by walking away stating, "You just keep that same energy when we're standing in front of a judge!". Defendant Hall then replied very loudly, so that other prisoners in the vicinity could hear, "We all know you can't wait to snitch, just like you've been doing around here, go ahead it's not going to cost me a dime!". Shortly after that exchange Defendant Hall began to maliciously tell other prisoners that the plaintiff was a snitch — on more than one occasion right in front of the plaintiff in an antagonizing manner. Branding an inmate a snitch can expose him to serious harm and may violate the Eighth Amendment (see: Merritte v. Kessel, 561 Fed. Appx. 546 (2014), [Hereinafter: 27]). At WVCF, there exists a presence of cronyism and nepotism amongst staff which prompted other custody officers to join in on spreading these malicious rumors and/or engaging in conduct that

BK1

demonstrates a campaign of harassment - quite often telling the plaintiff to stop filing grievances and/or civil suits when he questioned them as to the reason for their unprompted contempt towards him. Approximately forty-five days after the filing of the complaint in Babcock v. Wexford, supra, two prisoners who the plaintiff had no prior dealings with before-hand entered his cell and assaulted him with a weapon, causing serious injury. Their reason, they expressed that Wexford/Hall was saying that the plaintiff was a snitch and furthermore that filing all that paperwork "got the spot hot" and that the plaintiff "had to go". It is important to note that although there was a camera pointing directly at the plaintiff's cell that showed exactly who the two assailants were, no mis-conducts were written for the assault - despite visible injuries and the plaintiff being discovered unconscious. It is also important to note that despite having serious injuries to both eyes, the plaintiff's repeated requests to see the doctor was ignored for nearly two months. In

BK1

between times, several officers ridiculed Him, taunting "Try filing your lawsuit now!" More recently, Defendant Hall, while standing on post during chow line movement chose to further antagonize the plaintiff by saying, "what are you guys walking with Seabrooks for, He'll just testify on each and every one of you," to a group of prisoners who were walking along-side the plaintiff. The plaintiff ignored Her, but after the prison population began to renew their scrutiny against the plaintiff He filed a grievance that was followed by a letter to Defendant Vanihel once the grievance went unanswered [Ex VI]. Ultimately on November 20, 2023 the plaintiff was stabbed. The only words the plaintiff's attackers offered were, "we out here switch ass now nigger!". It is important to note that the plaintiff had no issues of being falsely - labeled a snitch at WVCF until Defendant Hall, and those acting in concert with Her began circulating the rumor.

Defendant Phillips, who was one of the bad actors the plaintiff attempted to avoid when

She joined the campaign of harassment by helping circulate the rumor that the she was a snitch, very purposefully went out of her way to bait the plaintiff into a negative confrontation one day she was assigned to work in his housing unit. After a brief exchange, Defendant Phillips threatened to write the plaintiff up on a trumped-up charge 'A-III, Trafficking'. Immediately, the plaintiff requested a supervisor - knowing that this was just another demonstration of the campaign of harassment alleged throughout this complaint and the accompanying 'Application For Temporary Restraining Order and Preliminary Injunction'. Sergeant Ynger soon responded and convinced Defendant Phillips to destroy the misconduct she had already begun to write. After Sergeant Ynger left, Defendant Phillips approached the plaintiff's cell expressing disdain over him alerting her superior by stating, "Seabrooks, don't you ever get tired of snitching?!" This statement was made so loudly every prisoner assigned to a cell location in that area could hear. Thus exposing the plaintiff to more scrutiny

BK3

Amongst prisoners At WVCF. It is Also important to note THAT, prior to The plaintiff's November 20, 2023 stabbing, He listed Defendant Phillips As An individual He needed to be kept seperate from in His "Application For Temporary Restraining Order And Preliminary Injunction" filed in Seabrook v. Wexford et al., supra. And After the plaintiff was placed in Protective Custody in response to His stabbing, He continued to receive Threats from Defendant Phillips THAT were intended to either punish The plaintiff for His past demonstration of protected conduct And/or deter The future exercise Thereof [Ex. XVIII - XXXII].

Defendant Sandoval, who The plaintiff HAd no prior dealings with beforeHAnd, decided to conduct A search of The plaintiff's cell location one morning she was Assigned to work in The plaintiff's Housing unit. After conducting The search, The plaintiff Returned to His cell to find it unduly Trashed, with The plaintiff's personal property strewn All over The floor — some items destroyed. When The plaintiff confronted Defendant Sandoval About The condition of His cell And destroyed

BK1

property, She returned, "What are you gonna do about it, sue me like you do everybody else?!" Immediately, the plaintiff requested a supervisor — especially after Correctional Officer Bishop informed him that, per policy Defendant Sandoval was supposed to leave his cell as close to the condition She found it as possible. Sergeant Donaldson responded, took note of the condition of the cell and destroyed property, then instructed him to file a Tort Claim — which the plaintiff did. This action further inflamed Defendant Sandoval, as She began to also circulate the rumor that the plaintiff was a snitch to other prisoners. Defendant Sandoval was not allowed to work the plaintiff's cellhouse for quite some time after that incident, until November 18th or 19th 2023. Although only there for a short time — to cover another staff member who was running late — camera footage (which the plaintiff insisted be preserved [Ex. XXIV]) will show Defendant Sandoval leaving her work station before

-11-

walking to an area near the plaintiff's cell location during movement for evening recreation, and then just stand there glaring at him in an intimidating fashion, while he was proceeding to empty his trash. Noticing her glaring, the plaintiff looked back towards her to witness her mouthing the words, "You snitch!" Sgt. Antagonize him. The following day, the plaintiff found a note under this door, written by an unknown author, calling him a snitch and threatening him harm if he left the cellhouse. In fear of the threat, the plaintiff did not leave the cellhouse for the entire day. Faced with hunger the following morning, the plaintiff made a stab-proof vest out of magazines to protect himself against a knife attack. However, the plaintiff was stabbed several times on his way to breakfast. Custody officers failed to promptly respond even leaving the plaintiff unattended for a period of time. No emergency signal was activated, nor was there any serious effort to

Apprehend the perpetrators — another inaction the plaintiff believes was the product of the wide spread campaign of Harassment he Alleges Throughout.

It is important to note That prior to the November 18, 2023 incident with Defendant Sandoval, in addition to the plaintiff (naming Her in the Tort Claim over destroyed property), He Also named Her As an officer He needed to be kept separate from just weeks earlier in a Notice of Application for Temporary Restraining Order And Preliminary Injunction filed in Seabrooks v. Wexford, Supra.

Defendant Matt Leohr, who was Also a defendant in Seabrooks v. Osburn, 2:17-cv-490-JMS-(MJ)D serves As The Classification Supervisor At WVCF. For years, The plaintiff Has Alleged Retaliation from This defendant in The form of :
A.) Refusing to Remove unverified and Arbitrarily-placed information in The plaintiff's institutional file That precludes Him from ever being transferred to
— 13 —

Any other facility except for Miami Correctional Facility which would not improve the plaintiff's quality of life due to that facility being more restrictive and violent than WVCF (See: Griffin v. Ind. Dep't of Corr., 2023 U.S. Dist. Lexis 87858, pg. 5); and, B.) Disqualifying the plaintiff from the most coveted job assignment at WVCF - and possibly the entire I.D.O.C - despite the fact he had already been hired [Ex. XXXVII]. The plaintiff's institutional file will confirm that he and his family are life-long residents of Detroit, MI. For this reason, it was judicially recommended that the plaintiff serve his sentence at Indiana State Prison, to relax the hardship on his family in regards to traveling for visitation. However, the only thing precluding the plaintiff from being able to transfer for several years is two suspicious staff-related separatee orders that didn't appear in the plaintiff's file until after he arrived at WVCF; and,

-14-

began exhausting Administrative
Remedies in <u>Seabrooks v. Osborn</u>, Supra.
Notice that the transportation order that
was completed before the plaintiff's
Arrival At WVCF lists zero seperatee
orders [Ex. XXXIX]. However, After the
plaintiff began exhausting Administrative
Remedies in that Action, two staff-
related seperatee orders Appeared in the
plaintiff's file involving ISP Internal
Affairs Officer Dustin And His wife
who Also worked At that facility. Per
I.D.O.C policy, seperatee orders have to
be sustaintiated by documentation
verifying the need for the order. Here,
the plaintiff maintains that He has never
even had the slightest encounter with
either party (i.e. misconducts involving
either party, undergoing Any question-
ing in Regards to some nefarious
connection with either party, etc.) And
Has no idea why these orders would even
exist. Nonetheless, After weakly seven
years of being major misconduct free
At WVCF, the plaintiff Anticipated being
-(5-

Subject of an annual review in which, per policy, He'd be permitted to request a transfer to be closer to home [Ex. XXXX]. By this time, the campaign of harassment was in full-swing. Prior to this review and out of concern for the plaintiff's well-being, his family contacted officials at ISP in attempt to ascertain why these orders would exist, and furthermore to learn what could be done to correct what appears to be a mistake. ISP officials responded that neither party has been employed at ISP for quite some time. Shortly after, the plaintiff wrote Defendant Leohr to ask that these orders — which were baseless to begin with (and now null and void — be removed. Defendant Leohr replied unfavorably.

Subsequently, the plaintiff filed a classification appeal and requested that the plaintiff's counselor check into the matter. However, the counselor responded by saying that she would not because she already knew that the plaintiff was on Defendant Leohr's "hit list". When

— 6 —

The plaintiff asked why, the counselor stated that it was due to all of the grievances and lawsuits. After the plaintiff was stabbed months later, the pled to Defendant Leohr once more to remove the seperatee orders. This request went without receipt. The plaintiff then filed another classification appeal, requesting that central office excercise it's supervisory powers to remove the orders [Ex. XXXXI]. The plaintiff received information from WVCF staff that Defendant Leohr was annoyed by me going over his head and as a retaliatory action Defendant Leohr has refused and continues to refuse to submit a facility-initiated transfer that the office of internal investigations recommended in response to the plaintiff's stabbing [Ex. XXXXII]. Although the plaintiff sioned the paperwork prepared to initiate the transfer on December 15, 2023, Defendant Leohr — who has to approve and submit it to central office — continues to refuse to submit it or provide the

-17-

plaintiff with a copy of the document
[Ex. XXXIV]. The plaintiff states that
Defendant Leohr's refusal to submit
the facility-initiated transfer covertly
punishes him for demonstrating
protected conduct by prolonging the
plaintiff's stay in segregation — under
the same punitive conditions as a
prisoner who was sentenced to disciplinary
segregation (i.e. limited property,
restricted movement, no commissary
privileges, etc.). It is important to
note that since the plaintiff's stabbing,
he has continued to be subject of
an ongoing campaign of harassment
that includes, but is not limited to:
A] The Grievance Specialist rejecting
Grievances for reasons the Court has
already deemed improper [Ex. I - XVI]
(See: Peacher v. Reagle, 2022 U.S. Dist.
Lexis 63060)("The Grievance Specialist
may not reject a grievance merely because
an offender seeks an improper or unavailable
remedy"... Id., pg. 4) ; B] An unknown
custody officer spitting on the wall of
— 18 —

The plaintiff's cell and leaving a noose on his bed [Ex. XII-XV ; c.] Continuous threats by Defendant Phillips, as well as other officers [Ex. XII & XXXXV-XXXXVII]. Foreign objects regularly found in the plaintiff's meal tray ; e.) Numerous times the plaintiff is given empty meal trays, with no food on it at all; and, f.) The non-answering of the plaintiff's medical request (grievance pending, along with a request to preserve camera evidence) [Ex. XXXXVIII - L].

The plaintiff maintains that all of these retaliatory activities - which are continuing until this very day - were employed to deter the plaintiff from exercising First Amendment Activity in the future and/or punish him for past demonstrations of protected conduct. The plaintiff believes he would not have experienced these retaliatory acts but for his protected conduct demonstrated in Seabrooks v. Wexford et. al, supra.

In regards to Defendant VanHel, the Supreme Court, as well as the Seventh Circuit has held that, "A prison officials

-19-

"deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment." (quoting: Farmer v. Brennan, 511 U.S. 825) (see also: Ieery v. Rice, 2003 U.S. Dist. Lexis 6759, pg. 12). The plaintiff submits evidence herein that demonstrates that He alerted Defendant Vanihel twice to the fact that several members of His custody staff were circulating a rumor that the plaintiff was a snitch to other inmates prior to His November 20, 2023 stabbing - that was a direct result of these false allegations. It is well-settled that the reputation as a snitch places a prisoner at substantial risk of injury at other inmates' hands (see: Ayscheman v. Catt, supra). Given that the plaintiff alerted Defendant Vanihel twice to the fact that His officers placed Him at risk of Harm due to these false labels prior to His ultimate stabbing, Defendant Vanihel's refusal to take reasonable steps to protect the plaintiff constitutes deliberate indifference.

## VI.  RELIEF

State exactly what relief or action you are requesting through this lawsuit.

1.) Plaintiff requests an order declaring that the defendants have acted in violation of the United States Constitution; 2.) An injunction compelling defendants to facilitate immediate transfer; 3.) Compensatory damages in the amount of $500,000.00 from each defendant; 4.) Punitive damages in the amount of $500,000.00 from each defendant;

## AFFIRMATION OF PLAINTIFF

(Continued on Additional page 2-1(B))

I, the plaintiff in the aforementioned cause, do affirm that I have read all of the statements contained in this complaint and that I believe them to be true and correct to the best of my personal knowledge and belief.

Signed this _____1st_____ day of _____February_____, 2024.

_____
Plaintiff

**BK3**

5.) An out of state transfer to the State of California or Michigan, pursuant to the Interstate Corrections Compact Ind. Code § 11-8-4-3; 6.) A jury trial on all issues triable by jury; 7.) The removal of any and all unnecessary seperate orders found in the plaintiff's institutional file; 8.) Plaintiff's costs in this suit; and, 9.) Any additional relief this Court deems just, proper and equitable.

-2 (B) -